IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DANIEL STAFFORD,**                                   Case Number 1:13CV1898

    Plaintiff,                                   Judge John R. Adams

    v.                                           Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                   REPORT AND RECOMENDATION

### INTRODUCTION

Plaintiff Daniel Stafford seeks judicial review of Defendant Commissioner of Social Security's decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). The district court has jurisdiction under 42 U.S.C. § 405 (g) and § 1383(c)(3). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2 (b)(1). (Non-document entry dated August 29, 2013). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

### PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI benefits on December 14, 2005 and December 22, 2005, respectively, alleging disability due to back pain and depression since June 10, 2004. (Tr. 25, 141, 144, 203, 206). His claims were denied initially, on reconsideration, and by an administrative law judge (ALJ) after a hearing. (Tr. 15, 129, 141, 144, 148). However, the Appeals Council vacated the first ALJ's decision because the ALJ did not properly translate Plaintiff's residual functional capacity (RFC) into specific functional terms and there was no vocational evidence. (Tr. 15).

Subsequently, on November 14, 2011, a second hearing was held before an ALJ. (Tr. 12, 958). Plaintiff, represented by counsel, and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 12, 958). The Appeals Council denied Plaintiff's second request for review, making the hearing decision the final decision of the Commissioner. (Tr. 2); 20 C.F.R. §§ 416.1455, 416.1481. On August 29, 2013, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

### Plaintiff's Vocational and Personal Background

Born on November 18, 1975, Plaintiff was classified as a younger individual during the relevant time period. (Tr. 33). He has a tenth grade education; prior relevant work experience as a laborer, auto detailer, landscaper, and spray painter; and received special education services. (Tr. 32, 961-62).

Plaintiff lived in a house with his wife and four minor children. (Tr. 216, 390). Concerning daily activities, Plaintiff indicated that he woke up, laid in bed, waited for his wife to make coffee, got up, sat in a chair, listened to the radio, played video games, built "models", watched television, helped his children with their homework, ate dinner, and went to bed. (Tr. 217, 220).

On a January 7, 2005 disability function report, Plaintiff claimed his wife helped him get dressed, bathe, cut his hair, get on and off the toilet, and cut his toe nails. (Tr. 218). He said his wife prepared his meals and reminded him to take care of personal needs. (Tr. 218). However, at the hearing, Plaintiff said he could fix his own meals. (Tr. 963).

Plaintiff sewed and changed light bulbs, did not drive (because his license was suspended), and did not shop. (Tr. 219). Citing difficulty in math, Plaintiff said he could not pay

bills, handle a savings account, or use a checkbook, although he could count change. (Tr. 220). Plaintiff claimed he could walk ten or fifteen feet before he needed to rest, had trouble paying attention, and used a cane, brace, and glasses. (Tr. 221). However, Plaintiff testified he could stand or walk for fifteen or twenty minutes and sit for half an hour before he needed to take a break. (Tr. 962-63). Plaintiff usually consumed a twelve-pack of beer in one sitting, and last consumed alcohol one or two months prior to the hearing. (Tr. 966).

***Medical Evidence***

Plaintiff was referred to Jermoe B. Yokiel, M.D., on October 7, 2004. (Tr. 373-74). Dr. Yokiel observed increased pain on range of motion and positive straight leg raise testing, and his impression was positive for lumbar radiculopathy. (Tr. 374). Dr. Yokiel prescribed pain medication and muscle relaxers then ordered an MRI of the lumbar spine, which revealed L5-S1 central disc herniation with impingement of both S1 nerve roots. (Tr. 372, 374). Thereafter, Dr. Yokiel administered three rounds of lumbar epidural steroid injections (on November 10, 2004, December 1, 2004, and December 8, 2004), which Plaintiff said provided temporary relief. (Tr. 368-71).

Plaintiff went to the emergency room for severe back pain on December 29, 2004. (Tr. 320-23). The next day, Plaintiff presented to Dr. Yokiel with complaints of increased pain and claimed no relief from medication. (Tr. 368). After examination, Dr. Yokiel indicated Plaintiff's symptoms had worsened, adjusted his medication regimen, and ordered a new MRI. (Tr. 368).

A second MRI was taken on January 8, 2005, which revealed mild osseous foraminal impingement upon the existing left L4 nerve root based on the left L4-5 osseous foraminal stenosis secondary to endplate spondylosis and facet arthrosis, a right L4-5 facet arthrosis with posterior facet ganglion or cyst, a L5-S1 disc desiccation with a broad-based posterior disc

protrusion, an annular rent producing sac distortion, and a mild neural impingement upon the budding right S1 nerve root sleeve. (Tr. 324-25, 367). Dr. Yokeil referred Plaintiff to Teresa Ruch, M.D., for a neurosurgical consultation. (Tr. 342, 367).

On January 16, 2005, Dean Pahr, M.D., diagnosed Plaintiff with lumbar radiculitis and described Plaintiff as having normal reflexes and muscle tone but also muscle spasms and pain behavior. (Tr. 327).

On February 7, 2005, Dr. Ruch examined Plaintiff, where she observed decreased sensation to approximately the T6 pin level, no feeling in Plaintiff's left arm, decreased sensation in his face, a positive bilateral straight leg raise test, and pain on palpitation. (Tr. 340). Dr. Ruch described Plaintiff as a man in "terrible distress", and concluded the following:

> I cannot explain his exam. It had nothing to do with the degenerative lumbar disc he has. I don't necessarily know that this is from his accident. It certainly doesn't make any sense since his accident was in '95, he worked landscaping for 8 years without any problems and now all of a sudden has this back pain. I think he needs a neurological workup. I find nothing surgical in his back that needs attention at this time. His exam certainly does not coincide with the MRI scan. I told him that obviously something [is] wrong, but lumbar surgery would not be an option.

(Tr. 340-41).

Plaintiff treated regularly with Frank G. Sailors, D.O., from at least October 22, 2003 through June 26, 2007. (Tr. 422-32). Generally, Plaintiff complained of an infected cyst behind his right ear (Tr. 430); a tender left adenopathy in the groin area (Tr. 429); bronchitis, chest pain, and numbness (Tr. 425, 427); depression (Tr. 423, 426); and increasing back pain unrelieved by medication and either caused by a car accident eight years earlier or by putting something down (Tr. 422, 427-28, 431-32). Dr. Sailors routinely prescribed Plaintiff medication to relieve his symptoms and also ordered an EKG. (Tr. 422-32).

On April 8, 2005, Plaintiff returned to Dr. Yokiel with complaints of low-back pain. (Tr. 366). Dr. Yokiel examined Plaintiff, noting an antalgic gait, use of a cane, bilateral lumbar paravertebral spasms, and increased pain on range of motion and straight leg raise testing. (Tr. 366). Dr. Yokiel advised Plaintiff to continue taking Percocet and ordered a neurological examination with Dr. Joseph Zayat. (Tr. 366).

On April 25, 2005, Plaintiff was referred to psychologist Richard C. Halas, M.A., for a consultative examination. (Tr. 343). Plaintiff arrived on time to the appointment and his appearance was unremarkable. (Tr. 343). He used a cane for ambulation and recounted a history of domestic violence and DUI convictions, though he denied current drug or alcohol abuse. (Tr. 344-45). Plaintiff minimized psychological symptoms and focused upon, and possibly exaggerated, the extent of his physical complaints. (Tr. 343). Based on his observations during the examination, Dr. Halas concluded Plaintiff would have no difficulty sitting, standing, or walking but his abilities to lift, carry, and handle objects was assessed as poor and below average. (Tr. 346). Plaintiff's hearing was intact but his speech was slow and constricted. (Tr. 346). Dr. Halas assigned an IQ score of 85 and found Plaintiff had moderate limitations in relating to others and coping with normal stressors and pressures of day-to-day work. (Tr. 345-47). Plaintiff's remaining areas of mental functioning were intact. (Tr. 347).

On September 6, 2005, Dr. Yokiel transcribed Dr. Zayat's insignificant neurological findings and noted Plaintiff had tested positive for marijuana (which Plaintiff characterized as a one-time mistake). (Tr. 328, 365). On examination, Plaintiff continued to exhibit tenderness to palpitation in the midline lumbar region, bilateral lumbar paravertebral spasms, and increased pain with range of motion and straight leg raise testing. (Tr. 365).

Plaintiff underwent an MRI on February 18, 2006, which revealed bilateral pars fracture at L4-L5 and a small central protrusion at L5-S1. (Tr. 386, 548).

Dr. Halas performed a second consultative examination on March 20, 2006, which produced findings similar to the first. (Tr. 388-91).

Plaintiff went to the emergency room on March 23, 2006 with complaints of chest pain and numbness. (Tr. 690). Although Plaintiff denied use of recreational drugs, a toxicology screen was positive for cocaine and marijuana. (Tr. 696-97, 698, 703).

On June 20, 2006, Plaintiff was referred to Paul Shin, M.D. (Tr. 528). On examination, Plaintiff's gait was normal; he could stand up on his tip-toes and heels; and he had tenderness to palpitation over the L4-5 juncture, intact (but slow) range of motion, negative bilateral straight leg raise testing, normal motor strength and sensory, and 1+ deep tendon reflexes at the knees and ankles. (Tr. 528). Dr. Shin acknowledged Plaintiff's complaints of increased back pain over the past year, possibly due to a car accident when he was eleven, but noted Plaintiff had successfully worked as a landscaper in the interim. (Tr. 528). An MRI taken the same day revealed degenerative changes at the inferior aspect of L4 and some joint space narrowing at L5-S1. (Tr. 547). Noting the ineffectiveness of conservative treatment to date, Dr. Shin recommended a trial of facet injection over the pars defect area at L4-5 bilaterally and an x-ray of the lumbar spine. (Tr. 529).

Plaintiff received a good response from three injections, so Dr. Shin recommended Plaintiff proceed with a bilateral L4-L5 facet medial branch nerve rhizolysis with radiofrequency lesioning, which was performed on October 19, 2006. (Tr. 476-88, 517-27).

Plaintiff followed up with Dr. Shin approximately eleven times from October 24, 2006 through December 5, 2007. (Tr. 489-516). Plaintiff consistently complained of low-back pain

and Dr. Shin routinely prescribed pain-relieving medication. *Id*. At times, Plaintiff was able to increase his activity level and was said to be doing well "overall". (Tr. 492, 511, 515). In fact, on November 8, 2006, Dr. Shin noted Plaintiff was off his medication, experienced minimal pain, and was able to resume "a lot of activities". (Tr. 511). For about a week, Plaintiff returned to work. (Tr. 245, 511).

However, beginning on December 19, 2006, Plaintiff said his back pain returned. (Tr. 530). On March 9, 2007, Plaintiff said his pain may have been exacerbated when he worked under his car in the cold weather. (Tr. 505). Subsequently, Plaintiff reported consistent pain but some relief from injections and medication. (Tr. 489-502). On December 5, 2007, Dr. Shin noted Plaintiff continued to have pain despite his medication regimen, regular steroid injections, and radiofrequency nerve ablation and therefore, Dr. Shin recommended Plaintiff be fitted for a Transcutaneous Electrical Nerve Simulation (TENS) unit. (Tr. 489, 530).

Plaintiff reported to the emergency room on February 22, 2007, complaining of left knee pain after tripping over his dog and striking a ledge. (Tr. 680-81, 686). An x-ray was negative and Plaintiff was discharged with crutches and Motrin. (Tr. 684, 688). Plaintiff also visited the emergency room on April 23, 2007, complaining of wrist pain caused by raking leaves over the weekend (Tr. 672-79) and again in May 2008, after he hurt his knee while kneeling on the roof of his house (Tr. 626-33).

Plaintiff was under the care of John Baron, M.D., in January 2008 for moderate chronic obstructive pulmonary disease (COPD) and possible sleep apnea. (Tr. 475). A sleep study done in March 2010 revealed mild obstructive sleep apnea and a pulmonary function test showed no significant airway disease. (Tr. 785-789, 866-69).

An MRI of Plaintiff's lumbar spine taken February 18, 2008 revealed mild grade 1 anterolisthesis of L4 on L5 and possible L4 pars defects bilaterally raising the possibility of spondylosis. (Tr. 444).

On May 6, 2008, Plaintiff presented to Richard Krajec, M.D., requesting an inhaler because he would lose his breath when he ran after his kids. (Tr. 453). He also complained of back pain and a rash. (Tr. 453). Dr. Krajec prescribed an inhaler and antibiotics. (Tr. 453).

On July 20, 2008, Plaintiff returned to the emergency room for injuries to his hands and wrists suffered when he fell off of a bicycle while "tipsy". (Tr. 448, 615-24). The following month, Plaintiff complained to Dr. Karjec of wrist and arm pain that would arise while operating his moped that had "motorcycle-like controls". (Tr. 445).

Nicholas Ahn, M.D., examined Plaintiff on December 1, 2008. (Tr. 796). Plaintiff had weakness and numbness in an L4 and L5-type distribution, worse on the right side, absent lower extremity reflexes, and positive straight leg raise testing on the right side. (Tr. 796). X-rays taken that day revealed isthmic spondylolisthesis of L4-L5 with a pars defect at L4 and dynamic instability. (Tr. 796). Dr. Ahn's impression was for neurogenic claudication with right greater than left L4 radiculopathy in a patient with isthmic spondylolisthesis of L4-L5 and foraminal stenosis at L3-L4 and L4-L5. (Tr. 796). Given the failure of conservative treatment and Plaintiff's statement that his quality of life was "absolutely unacceptable", Dr. Ahn recommended surgery. (Tr. 797).

On January 20, 2009, Plaintiff successfully underwent a bilateral Gill laminectomy of L4 with radical lateral recess decompression at the L4-5 level, laminotomy of L3 with L3-4 lateral recess decompression, and L4 nerve root foraminotomies, and a posterior spinal fusion at the L4-5 level. (Tr. 793-94, 802-04).

Five weeks after surgery, Plaintiff was doing "very well" and the "severe unrelenting pain that would run down his right lower extremity [had] essentially resolved, as [had] the numbness[,] tingling and weakness." (Tr. 793). Plaintiff had 5/5 strength, normal sensation, and some remaining back pain, which was expected. (Tr. 793). Dr. Ahn indicated Plaintiff was still smoking and was told he "absolutely must quit" or he would significantly affect the overall success of surgery in an adverse fashion. (Tr. 793). Dr. Ahn indicated Plaintiff's back pain may be caused by smoking. (Tr. 793).

Denise Flynn, M.S.N., saw Plaintiff on October 22, 2009 and September 1, 2010, when she performed a psychiatric evaluation and mental health assessment. (Tr. 779-83). On December 22, 2009, she reported Plaintiff was depressed, stressed, and drinking a lot. (Tr. 780). He had a history of domestic violence and suffered from physical abuse as a child. (Tr. 780). He enjoyed playing video games, building models, and could fix anything with a motor. (Tr. 780). Plaintiff averred his only source of income was fixing cars on the side. (Tr. 780). On September 1, 2010, Dr. Flynn reviewed Plaintiff's personal, vocational, educational, and medical history then diagnosed Plaintiff with major depression, generalized anxiety disorder, and alcohol dependence. (Tr. 783).

In late 2009, Angela Brinkman, M.D., prescribed a TENS unit. (Tr. 765-66).

An October 7, 2010 MRI of Plaintiff's lumbar spine revealed bilateral foraminal narrowing at L4-L5 without evidence of central canal stenosis. (Tr. 920). On November 29, 2010, an EMG revealed bilateral L5 radiculopathy and left S1 radiculopathy. (Tr. 904).

On January 13, July 29 and August 24, 2011, Joseph Kousa, M.D., examined Plaintiff with regard to his complaints of knee pain, neck pain, lower back pain, hypertension, asthma, COPD, sleep apnea, and depression. (Tr. 887-903). Plaintiff's physical examinations were

unremarkable aside from bilateral tenderness on both sides and limited flexion and grinding in the left knee. (Tr. 889, 893, 899, 902-03). Generally, Dr. Kousa prescribed various medications and oral inhalers. (Tr. 889-90).

On June 15, 2011, Gregory A. Moten, D.O., examined Plaintiff on behalf of the Bureau of Disability Determination and concluded Plaintiff had normal vision, hearing, communication, gait, muscle strength, and range of motion (except in his lumbar region). (Tr. 816-19). Plaintiff did not use a cane or walker, and his overall level of function was moderately restricted. (Tr. 819). Among other things, Dr. Moten opined Plaintiff was physically capable of occasionally lifting or carrying twenty pounds and frequently lifting or carrying ten pounds; sitting for four hours in an eight-hour workday; standing for two hours and walking for two hours in an eight-hour workday; occasionally reaching overhead, pushing, or pulling; frequently reaching, handling, fingering, peeling, and using right foot controls; occasionally balancing, stooping, kneeling, crouching, and climbing stairs and ramps; and never crawling or climbing ladders or scaffolds. (Tr. 819, 825-28). However, Dr. Moton found Plaintiff's physical impairments did not limit his abilities to shop, travel, ambulate without assistance, walk a block at a reasonable pace, use public transportation, walk a few steps with a hand rail, prepare simple meals, maintain personal hygiene, and sort, handle, or use paper files. (Tr. 830).

***ALJ Decision***

On March 30, 2012, the ALJ determined Plaintiff had severe impairments including degenerative disc disease of the lumbar spine, asthma and/or COPD, major depressive disorder, generalized anxiety disorder, borderline personality disorder, alcohol abuse, marijuana abuse in apparent remission since 2006, degenerative joint disease of the left knee with mucoid degenerative change and very small effusion, and obstructive sleep apnea. (Tr. 18-19). The ALJ

10

found these impairments alone and in combination did not meet or medically equal a listed impairment. (Tr. 20).

Next, the ALJ determined Plaintiff had the RFC to perform work activities subject to the following limitations: he could lift and carry no more than twenty pounds occasionally and ten pounds frequently, stand or walk no more than an aggregate of four hours per eight-hour workday, sit no more than an aggregate of four hours per eight-hour workday, and required a sit/stand option. (Tr. 25). Plaintiff could occasionally bend, stoop, crouch, squat, kneel, and crawl and occasionally climb steps and ramps. (Tr. 25). He could not climb ladders, ropes, or scaffolds; perform work in an environment where there was exposure to fumes, chemicals, dust, or agricultural or landscaping pollens in concentrations that exceeded what would be in the environment outside of or away from the workplace; perform work in an environment where there was exposure to extreme heat or cold; work in proximity to unprotected heights, dangerous moving machinery, or other workplace hazards; or operate a motor vehicle as part of a job. (Tr. 25-26). He could only do simple and low-stress tasks and could not do work involving high or strict production quotas; assembly line work or piece rate work; or work involving negotiation, arbitration, confrontation, or other intense interpersonal interactions with the public, coworkers, or supervisors. (Tr. 26). He could not manage or supervise other people or do work involving responsibility for the health, safety, or welfare of others. (Tr. 26). Based in part on VE testimony, the ALJ concluded Plaintiff could perform work as a final assembler, lens inserter, or cuff folder. (Tr. 34).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply

the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence, or indeed a preponderance of the evidence, supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five–step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can he perform past relevant work?

5.  Can the claimant do any other work considering his RFC, age, education, and work experience?

Under this five–step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only found disabled if he satisfies each element of the analysis, including inability to do other work, and meets the durational requirements. 20 C.F.R. §§ 404.1520(b)–(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff argues the ALJ: 1) failed to properly evaluate Plaintiff's impairments under listing 1.04 (spinal disorders); 2) manipulated VE testimony; 3) did not properly develop or consider a sit/stand option; 4) inappropriately characterized evidence of Plaintiff's education and attempt to return to work; and 5) improperly evaluated Plaintiff's credibility. (Doc. 15). These arguments are construed as challenges to the ALJ's findings regarding the listings, step five, and Plaintiff's credibility. Each argument is addressed in turn.

### *Listing 1.04*

First, Plaintiff argues the ALJ "failed to properly evaluate the evidence of record and to fully consider the requirements of the [l]istings", specifically listing 1.04. (Doc. 15, at 15).

The listings streamline the disability decision-making process by identifying people whose impairments are more severe than the statutory disability standard such that their impairments would prevent them from performing any gainful activity – not just substantial gainful activity – regardless of age, education, or work experience. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citing 20 C.F.R. § 416.925(a); Social Security Rule (SSR) 83-19, at 90). The

13

listings create a presumption of disability making further inquiry unnecessary. *Id.* Each listing establishes medical criteria, and to qualify for benefits under a listing, a claimant must prove his impairment satisfies all the listing's specified medical criteria. 20 C.F.R. § 404.1525(d); *see also Zebley*, 493 U.S. at 530.

Here, Plaintiff contends he meets listing 1.04, which describes spine disorders:

Disorders of the spine (e.g., herniated nucleus puposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. 404, Subpt. P., App. 1, § 1.04.

In this case, Plaintiff directs the Court to evidence which purportedly demonstrates "all the required elements of the [l]isting for the requisite amount of time." (Doc. 15, at 16). Plaintiff italicized selections from listing 1.04 in his brief. (Doc. 15, at 15). Ostensibly, Plaintiff challenges the ALJ's findings regarding listing 1.04(A), which requires the presence of *each of* the following for a consecutive period of twelve months or more: degenerative disc disease with evidence of nerve root compression characterized by neuro-anatomic distribution of pain,

14

limitation of motion of the spine, motor loss, sensory or reflex loss, and positive straight-leg raise testing. (Doc. 15, at 15-16); 20 C.F.R. 404, Subpt. P., App. 1, § 1.04.

Following careful review, the undersigned finds substantial evidence supports the ALJ's conclusion that Plaintiff's impairments did not meet or equal listing 1.04. Namely, the ALJ pointed to evidence of record demonstrating normal reflexes, negative straight leg raise testing, normal muscle strength, and no motor or sensory loss. (Tr. 20-21).

First, the ALJ found no evidence of motor loss. In support, the ALJ discussed Dr. Rauch's 2005 examination in detail. (Tr. 20-21, *referring to*, Tr. 340-41). Indeed, the ALJ considered Dr. Ruch's questions regarding the source of Plaintiff's extreme pain, as his complaints were unsupported by MRI results and Plaintiff was able to work for eight years after his car accident without significant pain. (Tr. 21, *referring to*, Tr. 340-41). The ALJ added that Dr. Ruch referred Plaintiff for a neurological examination because there was nothing to suggest he needed surgery. (Tr. 21, *referring to*, Tr. 340-41). The ALJ commented on Plaintiff's complaints to Dr. Rauch and her physical examination revealing "maybe" reduced motor strength in left foot dorsiflexion and 1+ reflexes throughout. (Tr. 21, *referring to*, Tr. 340-41). However, the ALJ reasoned that "maybe" cannot establish motor loss, and found no other evidence of motor loss in the record. (Tr. 21).

Although Plaintiff claims the ALJ "stressed" and "mischaracterized" Dr. Rauch's statement (that she could not explain the exam), review of the ALJ's opinion suggests otherwise. Indeed, the ALJ devoted a significant portion, but by no means the entire analysis, to Dr. Rauch's report. The fact that the ALJ did not mention Dr. Ruch's comment to Plaintiff, that "obviously something [is] wrong", does constitute error. In fact, the comment has nothing to do with the requisite elements of listing 1.04(A). Because the ALJ's summation of Dr. Ruch's

report is accurate and thorough, Plaintiff's contentions regarding the treatment of Dr. Ruch's opinion are not well-taken.

Contesting the ALJ's finding regarding motor loss, Plaintiff claims Dr. Yokiel reported motor and reflex loss on October 7, 2004. (Doc. 15, at 16) (citing Tr. 373-74). However, Dr. Yokiel observed "no sensory or motor deficits" on that date. (Tr. 373). Plaintiff also points to Dr. Ruch's 2005 report, Dr. Yokiel's 2004 treatment note, and Dr. Krajec's 2008 treatment note as evidence of motor loss. (Doc. 15, at 16). But again, none of those opinions establish motor loss. (Tr. 340-41, 368, 796). In short, the ALJ properly found no evidence of motor loss lasting for any period of twelve consecutive months or more.

Next, as part of his analysis at step three, the ALJ pointed to Dr. Shin's treatment notes spanning from June 2006 through December 2007, which generally show Plaintiff had a normal gait, intact range of motion, negative straight leg raise tests, and intact senses. (Tr. 21, *referring to*, Tr. 489-516, 528). The ALJ recognized Dr. Ahn's December 2008 report of an antalgic gait and L4-5 distribution of weakness and numbness (Tr. 796), but found the symptoms quickly resolved following surgery in January 2009, evidenced by Dr. Ahn's observation of 5/5 strength, normal sensation, and Plaintiff's comments that the numbness, tingling, weakness, and pain had resolved (Tr. 21, *referring to*, Tr. 793). Additionally, the ALJ pointed to Dr. Kousa's 2011 treatment notes, which indicated Plaintiff's physical examinations were generally unremarkable. (Tr. 21, *referring to*, Tr. 889, 893, 902-03).

It is also worth noting that the ALJ identified and considered evidence of sensory and reflex loss, but found insufficient evidence to persuade him Plaintiff met the listing (i.e. that *all* of the requisite impairments were present for a consecutive period of twelve months or more). (Tr. 21). Indeed, this is not a case where the ALJ summarily stated, without explanation, that

Plaintiff's impairments did not meet a listing. *See*, *Salah v. Comm'r of Soc. Sec.*, 2013 WL 3421825, at *7-8 (N.D. Ohio). Rather, the ALJ thoroughly considered the record against listing 1.04 but found Plaintiff did not satisfy the listing's requirements.

In sum, the ALJ properly considered the record and determined Plaintiff does not meet or equal listing 1.04. Therefore, Plaintiff's arguments with respect to the ALJ's step three determination are not well-taken.

**Step Five**

Next, Plaintiff argues the ALJ "manipulated the [VE's] testimony". (Doc. 15, at 16). Additionally, Plaintiff challenges the ALJ's hypothetical describing someone who could stand or walk for up to four hours in an eight-hour workday and sit for up to four hours in an eight-hour workday, claiming the hypothetical (and resulting RFC) is unsupported by the record. (Doc. 15, at 17). Plaintiff also argues the ALJ did not adequately develop or consider the sit/stand option, preventing the VE from providing proper testimony. (Doc. 15, at 18). In response, the Commissioner argues the ALJ's step five and RFC determinations are supported by substantial evidence and Plaintiff's argument regarding the sit/stand option is waived because counsel did not object at the hearing. (Doc. 17, at 8-9). Plaintiff's arguments implicate the ALJ's findings at step five.

To meet his burden at step five, the Commissioner must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id*. If an ALJ relies on a VE's testimony in response to a hypothetical to

provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (explaining that although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the VE with the ALJ's assessment of what the claimant "can and cannot do"). Moreover, "[i]t is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

First, the Court addresses that portion of the ALJ's hypothetical question (and corresponding RFC determination) restricting Plaintiff to standing or walking and siting for no more than four hours in an eight-hour workday. Plaintiff maintains there is "no support" in the record for this limitation. However, upon review, the hypothetical (and corresponding RFC) fairly set forth Plaintiff's restrictions and the ALJ adequately explained as much in his decision. *See*, *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) (an ALJ is only required to include limitations he finds credible).

Indeed, the ALJ considered Plaintiff's testimony that he could stand or walk for up to twenty minutes at a time and could sit for up to thirty minutes at a time. (Tr. 27). Moreover, the ALJ noted that aside from Drs. Ruch and Moten, no medical source opined on Plaintiff's RFC after the alleged onset date. (Tr. 29). The ALJ added that Dr. Ruch's opinion did not suggest Plaintiff had any restriction greater than those identified in the RFC, both because Plaintiff had been able to work in landscaping for eight years and she could not explain the examination's results. (Tr. 29). While Plaintiff suggests this last comment of Dr. Ruch's indicates a severe disability, at a minimum, it challenges the supportability of Dr. Ruch's physical examination.

18

Important here, Plaintiff has not identified objective evidence of record to refute the ALJ's findings.

In sum, the ALJ acted within the "zone of choice", wherein he may proceed without interference from the Court. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). It is not this Court's job to re-weigh the evidence. *Big Branch Resources, Inc. v. Ogle*, 737 F.3d 1063, 1069 (6th Cir. 2013). Therefore, Plaintiff's argument regarding Plaintiff's ability to sit, stand, and walk is not well-taken.

Next, turning to the sit/stand option, Plaintiff claims the ALJ never properly developed or considered the requirement because he did not consider "the duration requirements for each activity when considering a sit/stand option". (Doc. 15, at 17-18). In support, Plaintiff cites to *Wages v. Sec'y of Health and Human Servs.*, 755 F.2d 495, 499 (6th Cir. 1985) and Social Security Ruling (SSR) 83-12.

Relying on SSR 83-12, the court in *Wages* found the ALJ erred by using the grids to find the claimant could perform sedentary work where the evidence showed she required a sit/stand option. *Wages*, 755 F.2d at 499. However, *Wages* is distinguishable from the case at bar. Here, the ALJ did not rely solely on the grids, but also on the professional experience of a VE to find Plaintiff could perform a range of work subject to various limitations. *Bradley v. Sec'y of Health and Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988) ("This court has recently held that a claimant is not disabled simply based on a need to alternate between sitting, standing and walking, if a vocational expert can identify 1,350-1,800 unskilled sedentary jobs out of a total of 540,000 jobs that can be performed within the claimant's limitations.") (citing *Hall v. Bowen*, 837 F.2d 272 (6th Cir. 1988)).

Moreover, the ALJ's hypothetical clearly included a sit/stand option, which the VE twice-acknowledged and twice-clarified was not contemplated by the Dictionary of Occupational Titles (DOT). (Tr. 1000, 1002, 1005, 1008). Regarding duration requirements, the ALJ's hypothetical restricted plaintiff to no more than four hours of standing or walking and no more than four hours of sitting in an eight-hour workday. (Tr. 1005). Moreover, Plaintiff's attorney did not object to the VE's testimony in response to the hypothetical including a sit/stand option or the duration requirements. (Tr. 1011). Therefore, the record does not support Plaintiff's argument that the ALJ did not properly consider the sit/stand option.

Similarly, Plaintiff's assertion that the ALJ "manipulated" VE testimony is unpersuasive. Indeed, review of the hearing transcript demonstrates the VE understood the ALJ's hypotheticals and responded at will to the same. (Tr. 993-1017). Simply because the ALJ asked the VE multiple hypotheticals does not mean the ALJ "manipulated" testimony. The record shows the ALJ and VE discussed at length Plaintiff's abilities to sit, stand, or walk, and the testimony of the VE was unequivocal. *Id*. Simply put, allegations that the VE was manipulated are unfounded because the record shows the VE's testimony was freely given in response to the ALJ's hypothetical questions. *See, Varley*, 820 F.2d at 779.

To the extent Plaintiff claims the ALJ mischaracterized Plaintiff's education to the VE, that argument is without merit. (Doc. 15, at 18-19).  The ALJ found Plaintiff had no transferrable skills and was capable of only unskilled work. (Tr. 34). Moreover, the ALJ found Plaintiff had a limited education because he dropped out of school in eleventh grade. (Tr. 33). Even though Plaintiff had previously been held back, this does not change the fact he dropped out of school in eleventh grade. Therefore, the ALJ accurately portrayed Plaintiff's educational background.

*Credibility*

Last, Plaintiff challenges the ALJ's credibility determination. (Doc. 15, at 19). The Sixth Circuit recognizes that pain alone may be disabling. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). However, an ALJ is not required to accept a claimant's own testimony regarding his pain. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The regulations establish a two-step process for evaluating pain. *See* 20 C.F.R. § 404.1529; *see also* Social Security Ruling (SSR) 96-7p, 1996 WL 374186. For pain or other subjective complaints to be considered disabling, there must be: 1) objective medical evidence of an underlying medical condition; and 2) objective medical evidence that confirms the severity of the alleged disabling pain, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *Felisky v. Bowen*, 35 F.3d 1027, 1038 (6th Cir. 1994). This standard does not require "objective evidence of the pain itself." *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

A plaintiff's failure to meet the above-stated standard does not necessarily end the inquiry. Rather, "in the absence of objective medical evidence sufficient to support a finding of disability, the claimant's statements about the severity of his or her symptoms will be considered with other relevant evidence in deciding disability." *Swain v. Comm. of Soc. Sec.*, 297 F. Supp. 2d 986, 989 (N.D. Ohio 2003) (citing SSR 96-7p).

The ALJ is to consider certain factors in determining whether a claimant has disabling pain: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication to relieve pain; and 6) any measures used to relieve pain. 20 C.F.R. 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. An ALJ is not required, however, to discuss each factor in every case. *See*

*Bowman v. Chater*, 1997 WL 764419, at \*4 (6th Cir. 1997); *Caley v. Astrue*, 2012 WL 1970250, at \*13 (N.D. Ohio 2012).

Further, an "ALJ is not required to accept a claimant's subjective complaints" and may "consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476. An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters*, 127 F.3d at 531); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("we accord great deference to [the ALJ's] credibility determination.").

Here, in formulating his RFC determination, the ALJ acknowledged the requirement that he consider pain under SSR 96-7p and 20 C.F.R. § 404.1529. (Tr. 26). Although the ALJ determined Plaintiff's impairments could reasonably be expected to cause the alleged symptoms, he found Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with the RFC assessment. (Tr. 26).

In support, the ALJ pointed to Plaintiff's contradictory statements regarding his drug and alcohol use; namely, evidence that Plaintiff said he only used marijuana once, yet tested positive for marijuana on more than one occasion. (Tr. 28, *referring to*, Tr. 328, 365, 703). Moreover, there was evidence Plaintiff used cocaine despite telling doctors he did not use recreational drugs. *Id*.

Next, the ALJ pointed to evidence that discredited Plaintiff's allegations of debilitating pain, including that he raked leaves, chased his children, rode a bicycle while tipsy, repaired

vehicles for money, and worked underneath a car in the cold. (Tr. 28-29, *referring to*, Tr. 448, 505, 615-24, 672-79, 780). The ALJ also considered evidence that Plaintiff reported some relief from injections and radiofrequency lesioning and that his pain had essentially resolved. (Tr. 27, *referring to*, Tr. 368-71, 489-502, 793). Moreover, the ALJ considered Plaintiff's reported increase in activity and a brief return to work. (Tr. 27, *referring to*, Tr. 511, 515). Last, the ALJ found Plaintiff had less than marked restrictions in his activities of daily living, pointing to evidence that he was capable of self-care and preparing his own meals, using the internet, following television programs, playing video games, and building models. (Tr. 24, 27, *referring to*, Tr. 217, 220, 780, 830, 963).

Plaintiff claims the ALJ "ignored" and mischaracterized the evidence because he sought medical treatment after he raked leaves, chased his children, rode his bicycle while tipsy, and fixed a car in the cold. (Doc. 15, at 19). However, Plaintiff's argument is not persuasive because this evidence suggests Plaintiff's statements about his abilities are less than credible, as someone with debilitating pain could not rake, chase, ride a bike, or climb under a car.

Plaintiff also argues the ALJ improperly characterized Plaintiff's brief return to work. (Doc. 15, at 18-19). However, Dr. Shin's treatment note from the relative time period includes comments that Plaintiff was "certainly" able to do "a lot of activities" and was able to "tolerate the pain".   (Tr. 511). When viewed in context, Plaintiff's brief return to work is properly considered as a slight against his credibility.

Moreover, Plaintiff's reliance on *King v. Heckler*, 742 F.2d 968 (6th Cir. 1984) is not persuasive. In *King*, the Sixth Circuit remanded because there was "no conflicting evidence in the record on the issue of pain." *Id*. at 974 (emphasis in original). Unlike *King*, there is evidence in this record which conflicts with Plaintiff's allegations of debilitating pain, as referenced by the

ALJ and identified above. Therefore, the undersigned finds the ALJ's pain and credibility determination is supported by substantial evidence.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI benefits applied the correct legal standards and is supported by substantial evidence. Therefore, the undersigned recommends the Commissioner's decision be affirmed.

 s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).